Robert C. Fernley, Lois M. McNeil and Joan M. McCracken, Appellants *v.* The Board of Supervisors of Schuylkill Township, Appellee.

Argued April 5, 1983, before President Judge CRUMLISH, JR. and Judges BLATT, CRAIG and MAC-PHAIL.

Daniel Mungall, Jr., with him Jeanne Ward Ryan, Stradley, Ronon, Stevens & Young, for appellants.

Lois Reznick, Dechert, Price & Rhoads, for appellee.

OPINION BY JUDGE CRAIG, August 16, 1983:

Developers present this exclusionary zoning appeal from a decision of the Court of Common Pleas of Chester County which affirmed the Schuylkill Township Board of Supervisors' rejection of the developers' curative amendment attack upon the zoning ordinance's prohibition of multiple dwellings. The developers propose to erect 1556 residential units of multi-family dwellings (garden apartments, townhouses and fourplexes) on 245 acres, at densities ranging from 6.4 per acre to 14 units per acre.

This case presents a question of exclusionary zoning law which we have not previously encountered. The issue is:

Where a municipality factually is *not* a logical area for growth and development, may its zoning ordinance totally prohibit apartments without being legally invalid as exclusionary?

In seeking to apply the exclusionary zoning doctrines enunciated by the Pennsylvania Supreme Court, we must resolve whether or not we are required to pursue the fair share analysis laid down by the majority opinion (three of five justices) in *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977), where, as here, the pro-

hibition is total, and not just where the prohibition is partial.

The Schuylkill Township Zoning Ordinance, as the developers found it on April 16, 1975 when they filed their application, specifically provided:

*Section 1401. Attached, Semi-detached and Multiple Dwellings.* No attached or semi-detached building shall be used in whole or in part as a dwelling and no multiple dwelling shall be constructed in any district of the township other than two-family dwellings as permitted in sections 301, 401, 501 and 601 hereof.

Thus, the ordinance flatly prohibited multiple dwellings, and our scrutiny of the entire zoning ordinance discloses no meaningful exception to that prohibition. The reference to "two-family dwellings," as an exception, is meaningless because (1) the Schuylkill Township ordinance itself defines "Multiple dwelling" as a building designed for *more* than two families and (2) a two-family dwelling obviously does not constitute a multi-family dwelling in the sense of an apartment building as involved in *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970). Moreover, section 1402 of the ordinance, allowing a single-family detached dwelling "existing at the effective date of this ordinance" (March 25, 1955) to be converted for three-family use, does not constitute a viable exception to the apartment prohibition because it allows no *new* apartment construction whatsoever.

In thus interpreting the ordinance as prohibiting apartment construction of all kinds, we reach a conclusion different from that of the trial court.

However, we agree with the trial judge that the ordinance amendment of October 1, 1975, expressly allowing true multiple dwellings after the developers

filed their application, is of no effect here under the pending ordinance doctrine, *Casey v. Zoning Hearing Board of Warwick Township,* 459 Pa. 219, 328 A.2d 464 (1974), because there was no sufficient published notice of that amendment's consideration before the April, 1975 application date.

We next must consider the factual context. Our scrutiny of the testimony and exhibits gives us no basis for negativing the trial judge's affirmance of the key finding made by the board of supervisors, to the effect that Schuylkill Township is not a logical area for development and population growth. Located twenty-five miles northwest of Philadelphia, the township is not served by public transportation and is geographically isolated in relation to other road patterns. Economic studies place the township outside the Philadelphia housing market; the township is geographically separated from the Main Line growth area along U.S. Route 30. Population projections indicate only a 2% growth rate through the year 2000, with no growth in the two years after the adoption of the October 1975 amendment.

Thus, we face the issue stated above, and we turn to the majority opinion in *Surrick* as our guide.

In reviewing that opinion, we see much to suggest strongly that we must pursue the fair share analysis with respect to total exclusions like the one here, with the logical result being that an ordinance which totally prohibits apartments does not fall under the exclusionary zoning interdiction if the municipality does not constitute a population growth area.

Mr. Justice Nix's opinion in *Surrick* stated:

In Twp. of Willistown v. Chesterdale Farms, Inc., 462 Pa. 445, 341 A.2d 466 (1975), this Court reaffirmed its conviction that suburban

communities *which find themselves in the path of urban-suburban growth* cannot establish residential enclaves *by excluding population growth.*[5] Willistown in fact was no departure from precedent but merely a culmination of prior case law which had invalidated zoning techniques which seriously impeded or effectively "zoned out" population growth. See National Land Investment Co. v. Easttown Twp. Bd. of Adjustment, supra (invalidating a four acre lot minimum); Girsh Appeal, supra (invalidating a zoning ordinance which totally excluded apartment. . . . In striking down this land-use scheme [in Willistown] as "tokenism" and thus exclusionary, we extended the prohibition in Girsh to include not only total exclusion of multi-family dwellings but also *partial* exclusion of "selective admission." . . .

This Court's ruling in Willistown rested upon the premise of Girsh that where a municipal subdivision "is a logical place for development to take place, it should not be heard to say that it will not bear its fightful part of that burden." Appeal of Girsh, supra. . . . To implement these concepts, we adopted the "fair share" principle. . . . (Emphasis added.)

476 Pa. at 188-89, 382 A.2d at 108.

Although *Willistown* itself involved a partial exclusion, the *Girsh* exclusion was total. The *Surrick* opinion clearly does not place those two cases in separate analytical categories for analysis. Noting that *Girsh,* as stated, involved a total prohibition, we must also note the Supreme Court's declaration that "the premise of Girsh" was that a municipality cannot be exclusionary where it "is a logical place for develop-

414

ment to take place. . . ." 476 Pa. at 189, 382 A.2d at 108.

Cases involving total exclusion of industrial or commercial uses, such as *Beaver Gasoline Co. v. Osborne Borough,* 445 Pa. 571, 285 A.2d 501 (1971) (service station); *Exton Quarries, Inc. v. Zoning Board of Adjustment,* 425 Pa. 43, 228 A.2d 169 (1967) (quarry); *Eller v. Board of Adjustment,* 414 Pa. 1, 198 A.2d 863 (1964) (mushroom house); *Township of Paradise v. Mt. Airy Lodge, Inc.,* 68 Pa. Commonwealth Ct. 548, 449 A.2d 849 (1982) (extraction), and our recent *Churchill Borough v. Pagal, Inc.,* 74 Pa. Commonwealth Ct. 601, 460 A.2d 1214 (1983) (restaurant), have not followed the fair share analysis dependent upon the population-growth prerequisite. But they are distinguishable, not only because the Supreme Court decisions in the group antedated *Surrick,* but also because a population growth prerequisite, clearly relevant to the exclusion of residential population, is not similarly germane to the exclusion of nonresidential uses not directly affecting population.

As the *Surrick* opinion proceeded:

> The initial inquiry must focus upon whether the community in question is a logical area for development and population growth. Girsh Appeal, supra. . . .

476 Pa. at 192, 382 A.2d at 110. Significantly, *Surrick* cited *Girsh,* the total exclusion case, as authority for the pertinence of that initial inquiry. The remainder of the *Surrick* opinion leaves no doubt that an affirmative answer to the initial inquiry is a prerequisite to a conclusion that the zoning is exclusionary. We are to proceed to consideration of the present level of development only after we have "determined that a particular community is in the path of urban-suburban

growth. . .'', *Id.*, and then we are to proceed further to consider exclusionary impact after we have found "that a community is situated in the path of population expansion and is not already highly developed. . . .'' *Id.*

The final element of the *Surrick* matrix is most persuasive on this point. That last question is:

> Is there *total* exclusion of multi-family dwellings, which we disapproved in Girsh Appeal, supra, or is the exclusion *partial?* (Emphasis supplied.)

476 Pa. at 194, 382 A.2d at 111. Thus, the fair share analysis most certainly embraces total exclusions and is not to be used apart from total exclusion cases, that is, only in partial exclusion cases.[1] Indeed, in *Willistown,* with only 7/10ths of 1% of the municipality's land available for apartment development, and in *Surrick,* with only 1.14% so available, the exclusions were virtually total and therefore not substantially distinguishable from *Girsh.*

The fair share analysis was also applied in *Appeal of M. A. Kravitz Co., Inc.,*     Pa.     , 460 A.2d 1075 (1983), and in *Appeal of Elocin,*     Pa.     , 461 A.2d 771 (1983). Those plurality opinions affirmed the fair share test but we do not find the judgments in those two recent cases to be controlling here because *Elocin* involved an ordinance which prohibited only midrise and highrise apartments and townhouses, while the Justices were divided on whether or not the ordinance in *Kravitz* effected a total prohibition of townhouses.

---

[1] The dictum to the contrary in *Township of Paradise,* 68 Pa. Commonwealth Ct. at 552, 449 A.2d at 852 (a non-residential case) must necessarily be disavowed.

Moreover, in both *Elocin* and *Kravitz,* there was no clear finding that the municipalities were not in the path of population growth; indeed, both concurring and dissenting opinions appeared to regard the municipalities as ones in the process of development, so that the differences among the Justices would not appear to have indicated a departure from the majority concensus that the fair share population-growth analysis is applicable even to a prohibition which is total.

Accordingly, without reviewing this court's line of exclusionary zoning decisions—which doubtlessly have been beclouded by the actual judgments in *Elocin* and *Kravitz* at least as to townhouse prohibitions—our duty to apply the principles articulated by the highest court of our state leads us to affirm the decision of Judge STIVELY in the trial court here, on the basis that, because Schuylkill Township is not a logical area for growth and development, even an outright prohibition of apartment development, as we interpret the ordinance, does not constitute an invalid exclusion. We do not adopt or affirm the trial court's rationale to the extent that it is based upon the township's claims of lack of transportation, inadequate roads and sewage systems, nor do we approve the aesthetic and environmental concerns as being determinative in the fact situation presented here. We do, however, agree with the trial court's disposition of the developers' claims with respect to fees and costs.

### ORDER

Now, August 16, 1983, the order of the Court of Common Pleas of Chester County, dated February 25, 1982, is affirmed.

President Judge CRUMLISH, JR. concurs in the result only.